E-FILED | 8/14/2017 2:21 PM
GC-24-2017-C-233
Marion County Circuit Clerk
Rhonda Starn

## IN THE CIRCUIT COURT OF MARION COUNTY, WEST VIRGINIA

RICHARD HARRISON

a/k/a DIGGER HARRISON

AND

JESSE STOLZENFELS,

    PLAINTIFFS.

CIVIL ACTION NO._____

V.

JUDGE_____

THE MARION COUNTY COAL COMPANY,

MURRAY AMERICAN ENERGY, INC.,

OHIO VALLEY RESOURCES, INC.,

MURRAY ENERGY CORP.,

AND

ROBERT E. MURRAY, individually

RYAN MURRAY, individually,

PAM LAYTON, individually,

SCOTT NIETZELT, individually,

ROB MOORE, individually.

    DEFENDANTS.

### COMPLAINT

    Come Now Plaintiffs, Richard "Digger" Harrison and Jesse Stolzenfels, by and through counsel, Rachel Hanna, Esq., Law Office of Rachel Hanna, and pleads this complaint against Defendants and in support thereof states as follows.

## *I.    PARTIES*

1. Plaintiff Richard "Digger" Harrison, is and at all relevant times herein was a resident of Worthington, Marion County, West Virginia.

2. Plaintiff Jesse Stolzenfels is and at all relevant times herein was a resident of Thornton, Taylor County, West Virginia.

3. Defendant the Marion County Coal Company ("MCCC") is a foreign corporation with its local office in Mannington, Marion County, West Virginia with its principal office in St. Clairsville, Ohio conducting business throughout the State of West Virginia employing more than fifteen employees for more than twenty weeks in the State of West Virginia during the current year.

4. MCCC operates the Marion County Coal Mine (formerly known as and as referred herein as "Loveridge[1]").

5. Defendant Murray American Energy Inc. ("MAEI") is an authorized foreign corporation with its principal offices located in St. Clairsville, Ohio.

6. Until May 27, 2016 Defendant MAEI acted as the parent company of MCCC and provides services, including human resources services, to MCCC.

7. As of December 5, 2013, Defendant MAEI operates as a subsidiary of Murray Energy

---

[1] On December 5, 2013 Murray Energy purchased Loveridge from Consol.

Corporation ("MEC").

8. Defendant MEC is an authorized foreign corporation with its headquarters located in St. Clairsville, Ohio.

9. Defendant MEC is the parent corporation of Defendant MAEI and grandparent corporation of Defendant MCCC.

10. Upon information and belief, Defendant Ohio Valley Resources, Inc. is an Ohio Company with its headquarters located in St. Clairsville, Ohio[2].

11. Upon information and belief, Defendant Ohio Valley Resources, Inc. act acts as parent company of MCC.

12. Defendant MCC, Defendant MEC, and Defendant Ohio Valley Resources constitute a single integrated enterprise annually conducting business operations selling and shipping coal from Metz, WV and are sometimes herein collectively referred to as "Murray" or "Murray Defendants"[3].

13. Upon information and belief, Defendant Robert E. Murray (hereinafter sometimes referred to as "Bob Murray"), is and at all times relevant hereto was, a citizen and resident of St. Clairsville, Ohio.

14. Defendant Robert E. Murray is the Chief Operating Officer ("CEO") of Murray Energy.

---

[2] MSHA's legal identity report lists Ohio Valley Resources, Inc. as a Delaware Corporation.
[3] The agency relationships between and among the Defendants shall require discovery.

15. Defendant Robert E. Murray operates and controls all mines owned by the Murray Defendants.

16. Murray Energy Corporation is the largest underground coal mining company in America[4].

17. Murray Energy Corporation and its Subsidiary Companies employ approximately 6,000 Americans and currently operate thirteen active coal mines, consisting of eleven underground longwall mining systems and forty-six continuous mining units in Ohio, Illinois, Kentucky, Utah, and West Virginia. *Id.*

18. MEC employees over 2,800 individuals in the State of West Virginia. *Id.*

19. The public equates the mining business of each Defendant with Robert E. Murray.

20. Defendant Ryan Murray is Vice President of Operations of Murray Energy and a resident of Ohio.

21. Defendant Rob Moore is the Executive Vice President, Chief Financial Officer ("CFO"), and Chief Operating Officer ("COO") of Murray Energy and a resident of Ohio.

22. Defendant Pam Layton is the director of human resources at Marion County Coal and upon information and belief, a resident of West Virginia.

---

[4] http://www.murrayenergycorp.com/ July 13, 2017.

23. Defendant Scott Nietzelt is the Marion County Coal Mine Superintendent and, upon information and belief, a resident of West Virginia.

## II. FACTS

### A. Wrongful Discharge, Discrimination Findings, and Reinstatement

24. Plaintiff Richard Digger Harrison began working as a coal miner at Loveridge under Consolidation Coal Company ("Consol"), on or about February 20, 2005.

25. Mr. Harrison, is and at all times relevant to this complaint was, a General Inside Laborer at Loveridge.

26. As a union safety committeeman Mr. Harrison made complaints about unsafe conditions at the mine.

27. Mr. Harrison frequently serves as a representative of miners and accompanies federal and state safety inspectors on walk-arounds at the mine.

28. As a representative of miners Mr. Harrison made complaints about unsafe conditions at the mine.

29. Mr. Harrison suffers from a kidney disorder that has left him with the use of only one kidney.

30. Defendants are, and at all times relevant to this complaint were, aware of Mr. Harrison's kidney problems.

31. Plaintiff Jesse Stolzenfels began working as a coal miner at Loveridge under Consol on or about November 5, 2007.

32. Mr. Stolzenfels is, and at all times relevant to this complaint was, a general inside laborer at Loveridge.

33. On several occasions Mr. Stolzenfels acted as a representative of miners and accompanied federal and state safety inspectors on walk-arounds at the mine.

34. As a representative of miners Mr. Stolzenfels made complaints about unsafe conditions at the mine.

35. Plaintiff Stolzenfels currently serves as a union safety committeeman.

36. As a safety committeeman Mr. Stolzenfels made and continues to make multiple safety complaints concerning unsafe conditions at the mine.

37. In 2015 Bob Murray proposed to implement a "bonus plan" based upon production.

38. Plaintiffs' union membership, UMWA, voted against the bonus plan because the miners believed that the plan negatively impacted safety and would continue to do so.

39. Ignoring the vote, Bob Murray implemented the bonus plan anyway.

40. As part of the unilateral implementation of the bonus plan, the Murray Defendants issued bonus checks to miners with instruction to void and return the bonus check to payroll if the miner did not want the production bonus.

41. Plaintiffs, as union men, firmly believed the bonus plan negatively impacted safety.

42. Plaintiffs voided their bonus checks and returned the checks to payroll as instructed to protest Defendants' bonus plan. *Exhibit A(1)&(2); Voided Bonus Checks.*

6

43. In addition, Plaintiff Digger Harrison wrote "Kiss My Ass" on his bonus check to voice complaints about safety. Exhibit A (1).

44. In addition, Plaintiff Jesse Stolzenfels wrote "Eat Shit, Bob" on his bonus check to voice complaints about safety. *Exhibit A (2)*.

45. Plaintiffs' writings on the rejected bonus checks conformed to and reflected concerted union action to protest the bonus program Murray Defendants shoved down their throat.

46. Murray Defendants fired both Plaintiffs.

47. Defendants stated reason for discharge was violation of conduct rule No. 4- "profanity".

48. Plaintiffs became parties to two concurrent actions before the National Labor Relations

   Board (NLRB) and the Federal Mine Safety Health Review Commission (FMSHRC).

49. The NLRB complaint alleged unlawful labor practices and interference with labor organizing activity.

50. The FMSHRC complaint alleged Murray Defendants discriminated against Plaintiffs for engaging in activity protected by the Federal Mine Health and Safety Act, commonly called the Mine Act.

51. The UMWA also filed a FMSHRC complaint against Murray that alleged discrimination at multiple Murray mines based upon the bonus plan.

52. During the pendency of the administrative actions, Mr. Harrison suffered economic hardship and emotional distress including strain to his marriage.

53. During the pendency of the administrative actions, Mr. Stolzenfels suffered extreme financial hardship.

54. Mr. Stolzenfels vehicle was repossessed.

55. Mr. Stolzenfels nearly lost the family home he shares with his wife Amanda Stolzenfels, a school teacher, and their daughter Lilliam Soo.

56. During the pendency of the administrative actions Amanda worried that she would not have enough formula, milk, and juice to feed Lilliam Soo day to day.

57. On April 3, 2016 the NLRB order the Murray Defendants to cease and desist from discharging or restraining employees from engaging in union activity or protected concerted activity.

58. The NLRB found that Murray Defendants discriminated against Plaintiffs.

59. The NLRB ordered full reinstatement and backpay awards to Plaintiffs.

60. Pursuant to a settlement agreement FMSHRC ordered the Murray Defendants to pay a fine, post a notice at the Mine, to reinstate Plaintiffs to their former positions, and to pay the miners monetary damages.

61. Importantly Defendants agreed, and the *FMSHRC* Court ordered, Defendants "*not [to] interfere with the Mine Act rights of any miners or unlawfully discriminate against any miners for engaging in protected activity or exercising rights under the Mine Act.*"

62. Accordingly, Murray Defendants reinstated Plaintiffs to their former positions and posted the proscribed notice at the mine.

63. On April 11, 2016 Plaintiffs returned to work.

### B. The John Oliver Effect

64. Last Week Tonight with John Oliver is a late- night news satire program on HBO.

65. On June 18, 2017 Mr. Oliver considered the coal industry, President Trump's promise to bring back coal jobs, profiled Bob Murray's activities including his opposition regulations addressing black lung, and explored the 2007 Crandall Canyon disaster that killed six miners and three rescue workers at a Murray Mine. https://www.youtube.com/watch?v=aw6RsUhw1Q8 ; *See Also Exhibits B(1)-B(5).*

66. Sixteen minutes into the broadcast Mr. Oliver provided a brief overview of the facts and circumstances surrounding Murray wrongfully firing the Plaintiffs. *Exhibits B(6)-(8).*

67. The facts as recited by Mr. Oliver include reference to the union membership's "no" vote to the bonus plan and to the plan's impact on safety at the mine that formed part of the factual predicate for the NLRB and FMSHRC cases. *Exhibit B (9).*

68. Mr. Oliver did not mention Plaintiffs by name during the broadcast.

69. The NLRB case caption, including Mr. Harrison's and Mr Stolzenfels' name as Parties-in- Interest, was quickly visually referenced as Parties- in-Interest. *Exhibits B (6)-(9).*

70. The UMWA also appeared as Party-in-Interest in the NLRB case caption.

71. The broadcast included images of the miners' voided checks. *Exhibits B (10) & (11).*

72. The end of Mr. Oliver's broadcast included a giant squirrel, Mr. Nutterbutter, with an oversized check in the amount of three acorns and eighteen cents issued to "*Eat Shit Bob*" with "*Kiss My Ass*!" written on the note line. *Exhibit B (13).*

73. Mr. Oliver's broadcast was well received by the general public.

74. Mr. Oliver's broadcast ranked in the top 10 in the trending category on YouTube for several days after the broadcast.

75. Upon information and belief, Bob Murray was not amused.

76. On June 28, 2017, Bob Murray sued HBO, Time Warner, Mr. Oliver and others citing the June 18, 2017 broadcast.

77. In his complaint Bob Murray alleges that since the Oliver broadcast he has received multiple calls, emails, and communications stating "*Eat Shit*" and other remarks he deems unpleasant.

78. Bob Murray alleges that a "John Oliver effect" disrupted his business.

### C. Mandatory Awareness Meetings

79. Upon information and belief, after filing the complaint against HBO, Bob Murray, Ryan Murray, Scott Nietzelt, Rob Moore, and Pam Layton organized mandatory "awareness meetings" that required the attendance of all miners at Loveridge including Plaintiffs.

80. Two awareness meetings were scheduled on July 11, 2017 at 7:30 a.m. and 3:30 p.m. respectively[5].

81. Upon information and belief, prior to the awareness meetings, Defendants discussed information that miners were to be made "aware" of at the meeting.

82. Upon information and belief, prior to the awareness meetings, Defendants agreed upon information that miners were to be made "aware" of at the meeting.

83. Upon information and belief, prior to the awareness meetings, Defendants agreed that the John Oliver broadcast would be discussed at the awareness meetings.

84. Upon information and belief, prior to the awareness meetings, Defendants agreed that Mr. Harrison's and Mr. Stolzenfels would be discussed at the awareness meetings.

85. Upon information and belief, prior to the awareness meetings, Defendants agreed that the circumstances concerning Harrison's and Stolzenfels' discharge would be discussed at the awareness meeting.

86. Upon information and belief, prior to the awareness meetings, Bob Murray informed Defendants concerning those matters he would address and speak about during the awareness meetings.

87. On July 6, 2017 Plaintiffs received automated calls requiring the attendance of all miners at Loveridge, approximately 513 miners, at mandatory "awareness meetings" scheduled the following week.

---

[5] Upon information and belief, Bob Murray flew home in his private helicopter to rest between meetings.

88. Upon information and belief, Pam Layton recorded the automated calls.

89. Thereafter, Loveridge shift foremans and management routinely and repeatedly reminded all miners to attend the mandatory awareness meeting.

90. The awareness meetings were held in the auditorium at the local high school.

91. The 7:30 a.m. awareness meeting required Mr. Stolzenfels' attendance after working the midnight shift that ended at 5:30 a.m..

92. The 3:30 p.m. awareness meeting required Mr. Harrison's attendance.

93. Upon information and belief, additional awareness meetings were held at Murray's Blacksville[6] mine and Century Mine prior to Loveridge, at Murray's Robinson Run Mine after Loveridge, and possibly at other Murray mines.

### D. "Don't be a Harrison and Stolzenfels"

94. During both Loveridge awareness meetings, mine bosses patrolled the perimeter of the auditorium to keep watch over the miners.

95. During both awareness meetings, Bob Murray raised his voice angrily.

96. During both awareness meetings, Bob Murray heavily laced his remarks with profanity[7].

---

[6] Upon information and belief, during the post- midnight shift meeting at Blacksville a miner fell asleep and mine management removed him from the premises for so doing.

[7] Ironically, Defendants' defended wrongfully firing the miners citing a conduct rule, Rule 4, that prohibits profanity at the mine.

97. Bob Murray primarily focused his remarks on the John Oliver Broadcast.

98. Bob Murray made a series of very negative remarks about the Oliver broadcast during both awareness meetings.

99. During both awareness meetings, Bob Murray specifically referred to Plaintiffs' firing and the circumstances surrounding the agency actions.

100.      During both awareness meetings, Bob Murray intentionally and repeatedly used both Mr. Harrison's name and Mr. Stolzenfels' name.

101.      Bob Murray directed the miners' attention to Plaintiffs and Plaintiffs' protest concerning safety conditions at the mine during both awareness meetings.

102.      Plaintiffs felt like all eyeballs were on them during the awareness meetings.

103.      Bob Murray linked Plaintiffs and their protests concerning safety with Oliver's broadcast.

104.      Bob Murray deliberately and repeatedly cast Plaintiffs in a negative light.

105.      Bob Murray deliberately and repeatedly demeaned Plaintiffs.

106.      Bob Murray specifically referred to the voided bonus checks multiple times.

107.      Bob Murray repeatedly referred to Oliver's use of Plaintiffs' voided bonus checks.

108.      During the 7:30 a.m. awareness meeting Bob Murray stated "*Eat shit*" and "*Fuck you*" Bob were written on bonus checks.

109.     During the 7:30 a.m. awareness meeting Bob Murray stated: "*The checks were about* safety."

110.     During the 7:30 a.m. awareness meetings Bob Murray repeatedly stated "*Don't be a Harrison and Stolzenfels*."

111.     During both awareness meetings Bob Murray used the name "*Harrison*" and the name "*Stolzenfels*" metaphorically, as eponymous metaphors, to describe negative conduct, people, or circumstances.

112.     During both awareness meetings Bob Murray used the name "*Harrison*" and the name "*Stolzenfels*" as personifications of wrong, wrong action, or bad acts.

113.     Bob Murray discussed reports of his alleged attestation that a squirrel told him to open his own coal mines again referencing Oliver and Plaintiffs during both meetings.

114.     During the 3:30 p.m. awareness meeting Bob Murray stated that when the squirrel story originated he thought it was "*funny*" and "*started going with it*".

115.     During the 3:30 p.m. awareness meeting Bob Murray stated "*Compliance*[8], *what's compliance anyway?*"

116.     During the 3:30 p.m. awareness meeting Bob Murray stated "*Don't shut anything down to fix it.*"

---

[8] Compliance is about following the law. Compliance means safety at the mine.

117.    Each mandatory awareness meetings lasted approximately two and a half hours.

118.    Bob Murray disparaged Plaintiffs, Plaintiffs' names, and Plaintiffs' character throughout both mandatory awareness meetings at Loveridge.

119.    Upon information and belief, Bob Murray disparaged Plaintiffs, Plaintiffs' names, and Plaintiffs' character during mandatory awareness meetings at other mines.

120.    Defendants consented to Mr. Murray's remarks.

121.    The next pay period pay packets at Loveridge contained three pages of literature concerning the Oliver broadcast and Bob Murray's civil action against Oliver, the "*Coal King*" plea to the "*Court to Gag John Oliver*". Exhibit C.

*E. Discrimination and Hostile Environment post- Reinstatement and post- John Oliver Effect*

122.    Since his return to Loveridge, after resolution of the administrative cases, Mr. Harrison endured and continues to endure Murray's hostile work environment.

123.    Since his return to work at Loveridge new and additional concerns about safety at the mine compelled Mr. Harrison to file additional discrimination complaints with MSHA ("105(c) Complaints") as is his right under the Mine Act.

124.    Since his return to Loveridge Mr. Harrison lost his hearing to such an extent that he was awarded a percentage Workers Compensation.

125.    Mr. Harrison now requires a hearing aid.

126.    Nonetheless, with full knowledge of his impairment, Defendants assigned Mr. Harrison to work in noisy areas with decibel levels above industry standard.

15

127.    Defendants routinely assign Mr. Harrison to undesirable work assignments.

128.    Exposure to heat exacerbates Mr. Harrison's kidney problems.

129.    Defendants are aware of Mr. Harrison's kidney problems.

130.    Defendants are aware that heat exacerbates Mr. Harrison's kidney problems.

131.    Mr. Harrison requested reasonable accommodation for his kidney problems.

132.    Defendants recently assigned Mr. Harrison to pick up trash at the prep plant in conditions measuring 88 degrees with 66 percent humidity.

133.    Mr. Harrison recently passed out underground due to heat exhaustion.

134.    Defendants did not offer Mr. Harrison assistance when he passed out underground.

135.    Mr. Harrison was most recently ordered to shovel belt in the hottest part of the mine.

136.    Temperatures at the belt measured above 95 degrees Fahrenheit with extreme humidity.

137.    Mr. Harrison is currently on leave[9] due to exacerbated kidney problems.

_____

[9] There are potential irregularities concerning Plaintiff Harrison's leave. Additionally, potential issues exist concerning requested accommodation of working conditions and Plaintiff Harrison's kidney problems. Plaintiff

138.     Since his return to work at Loveridge, after resolution of the agency cases, Mr. Stolzenfels endured and continues to endure Murray's hostile work environment.

139.     Since the awareness meeting Mr. Harrison suffered severe stress, anxiety, illness, and exacerbation of his health problems.

140.     Since return to work Defendants also singled out and harassed Mr. Stolzenfels.

141.     After the awareness meeting Mr. Stolzenfels received unwanted attention.

142.     Bosses approached Mr. Stolzenfels with a handshake and remarked "*quite the celebrity*".

143.     Since the awareness meetings, Mr. Stolzenfels' supervisor screamed profanities at him in the presence of other miners, most recently accusing him of "*fucking off*".

144.     Since the awareness meeting Mr. Stolzenfels has suffered and continues to suffer severe stress and anxiety that causes distraction and upset.

145.     The incessant stress and constant anxiety contributed to a serious automobile accident that resulted in physical injury to Mr. Stolzenfels and total loss of his vehicle.

146.     The Stolzenfels family suffered and continue to suffer strain on their marriage because of Defendants' actions.

---

Harrison is attempting to resolve the foregoing issues privately. Nonetheless, Plaintiff Harrison specifically reserves the right to address those issues or any related issues via additional or amended pleadings if necessary.

III.   *CAUSES OF ACTION*

*A. Causes of Action*

*First Cause of Action*

*DISCRIMINATION AND VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT*

1.  Plaintiffs incorporate the foregoing paragraphs by reference as if fully stated herein.

2.  The *West Virginia Human Rights Act,* proscribes that it is an unlawful discriminatory practice for any person, employer, employment agency, labor organization, owner, real estate broker, real estate salesman or financial institution to: (1) engage in any form of threats or reprisal, or; (2) engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss, or (3) aid, abet, incite, compel or coerce any person to engage in any unlawful discriminatory practices. *W.Va. Code § 5-11-9(7)(A) (1998) (2006) et. seq..*

3.  *W. Va. Code §22A-1A-20* prohibits retaliatory conduct by employers against mine employees because of their reporting of violations of the Mine Safety Act. *Collins v. Elkay Mining Co.*, 179 W. Va. 549, 552 (W. Va. Mar. 17, 1988)

4.  A mine safety committeeman or any miner who communicates a safety violation under the Mine Safety Act and enforces a procedural right given under the collective bargaining wage agreement, and who thereafter is subject to discrimination by his employer as a result thereof, is entitled to assert the protections afforded by *W. Va. Code*

*§ 22A-1A-20. Id.*

5. Defendants engaged in unlawful discriminatory practices, violated, and retaliated against Plaintiffs based upon their exercise of the rights afforded to them by the *West Virginia Human Rights Act* and the State of West Virginia.

6. The Mine Safety Act is a substantial public policy of the State of West Virginia.

7. Defendants conduct and actions violate substantial public policies of the State of West Virginia including the Mine Safety Act.

8. As a direct and proximate result of Defendants' actions Plaintiffs suffered and continues to suffer damages including economic harms and losses, consequential, and special damages.

9. As a direct and proximate result of Defendants' actions Plaintiffs suffered and continue to suffer physical discomfort, emotional distress, loss of consortium, embarrassment, humiliation, and mental anguish damages in an amount to be proven at trial.

10. Defendants' actions are willful and wanton entitling Plaintiffs to punitive damages in an amount to be determined by the jury.

11. Defendants' actions violate the *WVHRA* and therefore entitle Plaintiffs to attorney fees and costs pursuant to *W.V. Code § 5-11-13.*

*Second Cause of Action*

*ASSAULT*

1.  Plaintiff incorporates the foregoing paragraphs by reference as if fully set out herein.

2.  At all times relevant to this complaint, Defendants employees acted within the line and scope of their employment.

3.  Defendants ratified employee conduct.

4.  Defendants ratified Bob Murray's conduct.

5.  Defendants acted intending to cause an imminent apprehension of harmful or offensive contact with Plaintiffs' person.

6.  Defendants installed bosses to patrol Loveridge awareness meetings.

7.  Defendants singled out Plaintiffs during the mandatory awareness meetings at Loveridge.

8.  Defendants thereby put Plaintiff in imminent apprehension of harmful or offensive contact with his person.

9.  Defendants deliberately threatened and intimidated Plaintiffs.

10. Plaintiffs were fearful of harmful or offensive contact with their person.

11. Defendants ratified its employees' threatening and offensive conduct.

12. Defendants ratified Bob Murray's threatening and offensive conduct.

13. As a direct and proximate result of Defendants' actions Plaintiffs suffered and continue to suffer economic harms and losses, consequential, and special damages.

14. As a direct and proximate result of Defendants' actions Plaintiffs suffered and continue to suffer emotional distress, physical discomfort, loss of consortium, embarrassment, humiliation, and mental anguish damages in an amount to be proven at trial.

15. Defendants' actions are willful and wanton entitling Plaintiffs to punitive damages in an amount to be determined by the jury.

*Third Cause of Action*

*SLANDER,*

*DEFAMATION,*

*&*

*NEGLIGENT INJURY TO REPUTATION*

1. Plaintiff incorporate the foregoing paragraphs of this Complaint by reference as if fully set out herein.

2. Defendants owed Plaintiffs a duty of care.

3. Defendants owed Plaintiffs a duty of care not to harm Plaintiffs.

4. The Mine Act is a substantial public policy of the State of West Virginia.

5. Defendants owed Plaintiffs a duty of care to act in accordance with the Mine Act.

6. Defendants slandered Plaintiffs during the mandatory awareness meetings at Murray mines.

7. Defendants published information in pay packets that places Plaintiffs in a false and negative light.

8. Defendants publication constitutes libel.

9. Defendants defamed Plaintiffs through spoken word and in writing.

10. Defendant Bob Murray referred to both Plaintiffs personally.

11. Defendants breached the duties owed to Plaintiffs by negligent acts or omissions.

12. Defendants proximately caused damage to Plaintiff as a result of the breach of duty including harm to Plaintiffs' and to Plaintiffs' reputations.

13. Defendants ratified its employees' conduct.

14. Defendants ratified Bob Murray's conduct.

15. As a direct and proximate result of Defendants' actions Plaintiffs suffered and continue to suffer economic harms and losses, consequential, and special damages.

16. As a direct and proximate result of Defendants' actions Plaintiffs suffered and continue to suffer emotional distress, loss of consortium, embarrassment, humiliation, and mental anguish damages in an amount to be proven at trial.

*Fourth Cause of Action*

*INVASION OF PRIVACY*

1. Plaintiff incorporates the foregoing paragraphs by reference as if fully set out herein.

2. Defendants organized multiple awareness meetings at Murray mines to discuss Plaintiffs, Plaintiffs' safety complaints, Plaintiffs as Parties-in-Interest, and Plaintiffs' private matters.

3. Defendants organized multiple mandatory awareness meetings at Murray mines to discuss the NLRB/FMSHRC cases that involved Plaintiffs.

4. Defendants organized multiple mandatory awareness meetings at Murray mines to discuss the Oliver broadcast and linked the broadcast to Plaintiffs.

5. Defendants organized two awareness meetings at Loveridge to discuss and disparage Plaintiffs and their protest concerning safety conditions at the mine.

6. Defendants' demand that all miners attend multiple awareness meetings caused substantial harm to Plaintiffs.

7. Defendants ratified its employees' conduct.

8. Defendants ratified Bob Murray's conduct.

9. Defendants published information placed in miners in pay packets that place Plaintiffs in a false and negative light.

10. Defendants actions constitute an invasion of privacy.

11. Defendants actions constitute an unreasonable intrusion into Plaintiffs' privacy.

12. Therefore, Defendants invaded Plaintiffs' privacy.

13. Defendants actions proximately caused and continue to cause damage to Plaintiffs including placing Plaintiffs in false light.

14. As a direct and proximate result of Defendants' actions Plaintiffs suffered and continue to suffer economic harms and losses, consequential, and special damages.

15. As a direct and proximate result of Defendants' actions Plaintiffs suffered and continue to suffer emotional distress, physical discomfort, loss of consortium, embarrassment, humiliation, and mental anguish damages in an amount to be proven at trial.

*Fifth Cause of Action*

*OUTRAGE*

1. Plaintiff incorporates the foregoing paragraphs as if fully setout herein.

2. Defendants conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

3. Defendants' conduct was intentional, extreme, outrageous, and reckless.

4. Defendants ratified its employees' conduct.

5. Defendants ratified Bob Murray's conduct.

6. Defendants' actions are willful and wanton entitling Plaintiffs to punitive damages in an amount to be determined by the jury.

7. As a direct and proximate result of Defendants' conduct Plaintiffs suffer and continue to suffer economic harms and losses, consequential, and special damages.

8. As a direct and proximate result of Defendants' actions Plaintiffs suffered and continue to suffer emotional distress, physical discomfort, loss of consortium, embarrassment, humiliation, and mental anguish damages in an amount to be proven at trial.

## Sixth Cause of Action

### NEGLIGENCE

1. Plaintiff incorporates foregoing paragraphs by reference as if fully set out herein.

2. Defendants owed Plaintiffs a duty of care.

3. Defendants breached the duties owed Plaintiffs by negligent acts or omissions.

4. Defendants' breach of duty proximately caused damage to Plaintiffs.

5. As a direct and proximate result of Defendants' breach Plaintiffs suffered and continue to suffer economic harms and losses, consequential, and special damages.

6. As a direct and proximate result of Defendants' actions Plaintiffs suffered and continue to suffer emotional distress, physical discomfort, loss of consortium, embarrassment, humiliation, and mental anguish damages in an amount to be proven at trial.

## Seventh Cause of Action

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

1. Plaintiff incorporates the foregoing paragraphs by reference as if fully set out herein.

2. An employment contract existed between Plaintiffs and the Murray Defendants.

3. Defendants are aware of the existence of an employment contract between Plaintiffs and Murray Defendants.

4. Defendants intentionally breached that contract.

5. Defendants' breach was without justification.

6. Defendants' breach proximately caused damage to Plaintiffs.

7. As a result of Defendants' breach Plaintiffs suffered and continue to suffer economic harms and losses, consequential, and special damages.

8. As a result of Defendants' breach Plaintiffs suffered and continue to suffer emotional distress, physical discomfort, loss of consortium, embarrassment, humiliation, and anxiety.

9. Defendants acted willfully and wantonly.

10. Therefore, Plaintiffs are entitled to punitive damages and attorney fees.

## IV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Richard Digger Harrison and Plaintiff Jesse Stolzenfels, pray for the following relief.

a. That the Defendants herein be held jointly and severally liable.

b. That the Defendants compensate Plaintiffs for all harms and losses proximately caused by Defendants in an amount to be proven at trial.

c. Consequential damages.

d.  Special damages.

e.  Past and future lost wages and lost benefits in an amount proven at trial.

f.  Economic harms and losses.

g.  Damages for emotional distress, inconvenience, and annoyance past and future.

h.  Damages for loss of consortium.

i.  Damages for harm to reputation.

j.  Pre-judgment and post-judgment interest.

k.  Punitive damages.

l.  Reasonable Attorney's fees and costs.

m.  Such other legal or equitable relief as this honorable court deem just and proper.

## V. DEMAND FOR JURY TRIAL

Plaintiff, Richard Digger Harrison and Plaintiff Jesse Stolzenfels, demand a jury trial on all issues triable by a jury.

Respectfully Submitted,
PLAINTIFFS

By Counsel

/s/ Rachel Hanna

Rachel Hanna, WVSB #9767

Law Office of Rachel Hanna
117 East Washington St.
Lewisburg, WV
rachelhanna@rachelhanna.com
(304) 793-4529 *telephone*
(304) 793-4530 *facsimile*

E-FILED | 8/14/2017 2:21 PM
CC-24-2017-C-233
Marion County Circuit Clerk
Rhonda Starn

Exhibit A (1)



Exhibit A(2)



E-FILED | 8/14/2017 2:21 PM
CC-24-2017-C-233
Marion County Circuit Clerk
Rhonda Starn





**EXHIBIT B (3)**



**EXHIBIT B (4)**



**EXHIBIT B (5)**



**EXHIBIT B (6)**



**EXHIBIT B (7)**



**EXHIBIT B (8)**



**EXHIBIT B (9)**



**EXHIBIT B (10)**



**EXHIBIT B (11)**



**EXHIBIT B (12)**



E-FILED | 8/14/2017 2:21 PM
CC-24-2017-C-233
Marion County Circuit Clerk
Rhonda Starn

# DAILY BEAST

# Coal King Begs Court to Gag John Oliver

The CEO of America's largest privately owned coal company is suing the late-night comedian for defamation—and wants to silence his show in the meantime.

BETSY WOODRUFF
06.30.17 5:50 PM ET



A coal executive is seeking a gag order against John Oliver and HBO. The executive in question, Robert Murray, sued Oliver for defamation earlier this month, alleging that the HBO host's June 18 show was character assassination.

While the litigation plays out, Murray wants Oliver to stop talking about him—and he wants HBO barred from re-broadcasting the episode in question. In a motion filed in the Marshall County Circuit Court in West Virginia on June 28, Murray's lawyers asked Judge Jeffrey Cramer to bar HBO from re-broadcasting the June 18 episode of Oliver's show, Last Week Tonight, and to bar Oliver and the other defendants (including the show's writers) from discussing the lawsuit in public. That could mean HBO would have to take down any YouTube videos of the episode, according to First Amendment litigator Ken White, who called Murray's effort to get a gag order "astonishingly frivolous."

In the filing, Murray's lawyers said Oliver incited his audience to "vigilantism" against the coal executive. Spammers tried to crash his company's website, according to the motion, and the company had to take its entire site down on June 20 "to implement new, increased security measures."

In a statement to The Daily Beast, HBO called Murray Energy's request "a dangerous and unprecedented violation of the First Amendment rights of HBO, John Oliver and the show, and we look forward to presenting our case in court."

Oliver's viewers have also been calling employees of Murray Energy, according to the filing, and saying, "Tell Bob Murray to eat shit!"

According to the filing, one caller said, "Your owner is a pussy and he's fat!"

"Others demanded that Plaintiffs 'Stop with their bullshit lawsuits' or asked, 'Why are you suing John Oliver?'" the motion said.

The motion quoted another caller as saying, "This is a squirrel, F@@@ you Bob, F@@@ you Bob!" and another as telling employees to "watch their back."

The motion said Murray's son also got a phone call "that wished him death."

The motion described this as part of the "John Oliver Effect," and noted that Time and Fortune have reported on the enormous response that people criticized on his show receive from his viewers.

The motion also says hacking could endanger workers in Murray's mines.

"Murray Energy hosts sensitive computer networks responsible for monitoring all critical safety aspects relating to underground mine conditions," the motion said. "These systems monitor, among other things, the quality and composition of breathable air, seismic events, and all other critical aspects that ensure the complete safety of all underground personnel. A security breach of this network literally is a threat to life itself."

Murray's business is suffering, according to the complaint; the coal executive's attorneys wrote that the company's phone system had to be taken down and upgraded, and that employees can't get back to customers fast enough because of the time it takes to deal with harassment.

June 26, 2017
IHS Coal & Energy

# Bob Murray sues Time Warner, HBO

Murray Energy owner Bob Murray is taking on two cable TV giants in the courtroom.

"In response to the blatantly false, totally concocted, and deliberately destructive statements made against Bob Murray, Murray Energy Corporation, and certain of its West Virginia Subsidiary Companies, Murray and Murray Energy confirm that they have sued Time Warner, Inc., Home Box Office, Inc. (HBO), and their operatives for the false and defamatory statements that they made during the broadcast of an episode of 'Last Week Tonight with John Oliver' on June 18, 2017," Murray Energy said in a statement released Wednesday.

"The deceitful and damaging statements of Time Warner, HBO, and their operatives were clearly a deliberate attempt to assassinate the character of Mr. Robert E. Murray, a champion of the United States coal industry and patriotic American, and to destroy Murray Energy, a company which Mr. Murray founded nearly thirty years ago and built into the largest underground coal mining company in the United States," the statement continues. "Allowing these false statements to stand unrefuted would be a disservice to the Company's employees, who rely on Mr. Murray and Murray Energy for their continued livelihoods, and to the Company's lenders, customers, and suppliers who depend on our integrity and performance."

Murray singled out the alleged "false and defamatory statements in this broadcast" as "severely and destructively" impacting "Mr. Murray, and all of Murray Energy, particularly our Mines in the State of West Virginia."

Murray Energy said it "filed this lawsuit, in part, in order to protect these lives and family livelihoods from the further damage by people who do not want to see coal mined, and want all of those lives destroyed, and will stop at nothing, including lying and fabrications, to accomplish their goal."

The lawsuit was filed in a West Virginia court.



# Greenwire

## Murray, claiming death threats, seeks HBO restraining order

Emily Holden, E&E News Reporter Published: Friday, June 30, 2017

Murray Energy Corp. CEO Robert Murray said his lawyers are pursuing a restraining order against comedian John Oliver and HBO, Murray told E&E News yesterday.

Murray is suing Oliver and the makers of his show, "Last Week Tonight with John Oliver," in West Virginia state court for a segment earlier this month that ridiculed Murray and argued President Trump is lying to coal miners about the sector's future.

Murray told E&E News after a Department of Energy event yesterday that he considers the an attack on his legacy.

Murray Q----- is also get his life ------- He said he had received than 60 death threats and got so emails that his computer systems crashed.

The day before the show aired, Murray said, his lawyers spoke Oliver's lawyers for an hour and Murray's team sent two letters spelling out why they disagreed facts and figures Oliver planned present.



show

in more many

0

with a half.

with to

Lawyers for Murray will seek to keep HBO and parent company Time Warner Inc. from re-airing the show and force them to take down calls for viewers to contact Murray.

"I've done nothing for 61 years but create very good American jobs. I've never been arrested in my life. Nothing, not even a parking ticket," Murray said.

In 2012, a Murray subsidiary agreed to pay $500,000 in fines to resolve charges related to the 2007 Crandall Canyon mine collapse in Utah. The company has long maintained the facility was safe.

Murray said he's an old man and all he has left in his life are his integrity and credibility. "I've created jobs, I'm a God-fearing man, and I'm highly respected by the people that know me," he said. "Yet for the sake of money, Home Box Office and Time Warner have caused me to have many threats on my life."

Murray said, "I'm not going to, for the sake of money, have Time Warner or HBO or a foreign national, John Oliver, who he is, who is being investigated for tax evasion right now ... he lives in a $10 million apartment in New York, attack my credibility and reputation."

It's unclear whether Oliver is indeed under investigation, although some outlets have reported he used legal loopholes to reduce his property taxes.

Murray said if his reputation is damaged, he can't get loans to do his business. "It's about my employees, it's not about me, I can withstand it," he said.

Murray's lawsuit claimed that since the segment aired, his health has "significantly worsened, likely further reducing his already limited life expectancy."

During President Trump's speech at the event, he singled out Murray, who uses an oxygen tank, and appeared to be asking about his health.

Murray has long been a figure of interest in energy and politics, being a fierce defender of coal and candidates who support the fuel, like the president.

HBO told media outlets after the suit, "We have confidence in the staff of 'Last Week Tonight' and do not believe anything in the show this week violated Mr. Murray's or Murray Energy's rights."

The company told E&E News in a statement today, "Murray Energy's request is a dangerous and unprecedented violation of the First Amendment rights of HBO and the show, and we look forward to presenting our case in court."

•••